UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ANTHONY DAY, | ) | |
| | ) | |
| Movant | ) | |
| | ) | |
| v. | ) | Civil No. 07-97-P-S |
| | ) | Criminal No. 04-23-P-S |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent | ) | |

**RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION**

Anthony Day went to trial before this Court on charges that he was involved in a crack cocaine conspiracy. The jury found him guilty and this Court sentenced Day to 165 months in prison. Day filed a direct appeal which was decided against him. He now brings a 28 U.S.C. § 2255 motion, supplemented by a forty-two page memorandum, containing grounds asserting ineffective assistance of counsel, prosecutorial non-disclosure, improper jury instructions, new evidence concerning the veracity of witnesses, and "prejudicial testimony." Day has also filed a thirty-page reply memorandum.[1] For the reasons below, I recommend that the Court deny Day 28 U.S.C. § 2255 relief.

---

[1] The reply memorandum commences with Day's point-by-point attacks on the government's statement of the case and trial transcript citations. (Reply Mem. at 4 -8.) In doing so, Day cites to different parts of the trial transcripts which he thinks rebuts the government's version of the trial testimony or vis-à-vis which he claims the witness is lying. He also argues that it was misleading to allow testimony describing defendants as "The Boys" because it sent the subliminal message that this referred to Day. (Id. at 6-7.) He then turns to picking apart the Government's description of preliminary matters. (Id. at 8-26.)
   Section 2255 proceedings are not a platform for picking nits out of the trial testimony and I have focused on Day's substantive claims, taking into account Day's reply memorandum as relevant to his

*Discussion*

With regards to Day's claims of ineffective assistance and his challenges to the conduct of the trial and sentencing hearing, this Court can draw on its first-hand knowledge of the trial and sentencing in weighing the merits of Day's § 2255 grounds. See United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993) (observing that, when, a "petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing."); see also, e.g., Sanford v. United States, 495 F. Supp. 2d 151, 155 (D. Me. 2007).

**A.    *Ineffective Assistance of Counsel Claims***

With respect to Day's ineffective assistance claims that pertain to counsel's advice to plead guilty, evidentiary issues, and advice concerning sentencing, in United States v. Colon-Torres the First Circuit Court of Appeals explained:

> The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." It is well settled that this right to effective assistance of counsel attaches at all critical stages of the trial, United States v. Wade, 388 U.S. 218 (1967), including at sentencing. Gardner v. Florida, 430 U.S. 349, 358 (1977) (holding that "sentencing is a critical stage of the criminal proceeding at which [defendant] is entitled to the effective assistance of counsel").
> The touchstone for any ineffective assistance of counsel claim is the two-part test laid down by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).
>> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so

---

§ 2255 claims and disregarding Day's disputation of the United States' preliminary description of Day's criminal proceedings.

>       serious as to deprive the defendant of a fair trial, a trial whose
>       result is reliable.
> Id. at 687. In other words, defendant "must show that counsel's performance was so deficient that it prejudiced his defense." United States v. Ademaj, 170 F.3d 58, 64 (1st Cir.1999) (summarizing Strickland). As the Strickland Court explained, "[u]nless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Strickland, 466 U.S. at 687.

382 F.3d 76, 85-86 (1st Cir. 2004).

In discussing his ineffective assistance claims in his pleadings, Day generally asserts that while he does not suspect that his court appointed attorney harbored malice towards him, he does believe that his ineffective assistance stemmed from counsel's lack of experience in complicated criminal cases. (Sec. 2255 Mem. at 2.)[2] He maintains that his attorney told his mother that he was concerned for Day because the attorney did not think he could do the job. (Id. at 18; Reply Mem. at 17.)[3] Day argues that he never sold cocaine base/ crack and that the witnesses against him lied when they testified that he did and that these lies went unanswered by his attorney. (Sec. 2255 Mem. at 3.) I address his specific complaints in turn.

### 1.     *The Gun and the Brad Phillips Robbery*

Day faults his attorney for not arguing for the admission of evidence of the Brad Phillips robbery by co-defendant Dylan Neill (Sec. 2255 Mem. at 3-4) towards the end of demonstrating that the gun that Neill testified Day gave him was in fact a gun that Neill had during the robbery. Day's theory seems to be that the prosecution was hoping to

---

[2] I refer to the pages of Day's 28 U.S.C. § 2255 memorandum by the page number assigned by the court. Day does not assign a page number to his introductory page so his numbers are one step behind the actual number of pages in his memorandum.

[3] The United States points out that since 1995 Day's attorney appeared as counsel of record in at least sixty-three cases at the trial level, fifty-one of which were criminal. (Gov't Resp. at 28.) Day responds that the United States is not specific enough about the nature and severity of the cases undertaken by his attorney. (Reply Mem. at 16-17.)

3

make it look like there was one gun used in this robbery although there were two individuals involved in the robbery and there was grand jury testimony suggesting that Neill and his co-robber each had a gun. (Id. at 4-5, 13-14.) Day believes that his attorney "simply wrote off" this evidence which could have been used to impeach Neill and passively agreed to the exclusion of the evidence of the Phillips robbery. (Id. at 5; Reply Mem. at 26.) While Day concedes that evidence of the robbery did come in despite the imposition of a limitation on such evidence by the court, he opines that the jury was not presented with this as evidence that Day did not give Neill the gun found on Neill at the courthouse but were left with the impression that Day gave Neill the gun to protect Neill from retaliation because of Neill's involvement in the Phillips robbery. (Sec. 2255 Mem. at 5-8.) Day acknowledges that his attorney tried to convince the court that he should have the opportunity to cross examine Neill on the issue of who gave him the gun once the co-defendant's attorney opened the door to this testimony. (Id. at 7.)

"Because the introduction of the .22 caliber revolver in which Dylan Neill was arrested," Day argues, "was a planned tactic of the government, the government had an obligation to produce an investigation report on this gun, including but not limited to fingerprints, since Neill claims that Day had given him this gun on the way to the court and the government adopts this claim." (Id. at 8.) He claims that if the government's version is true, Day's fingerprints should have been on the gun, the government should have had a report to this effect, this report should have been turned over to the defense, and Day's attorney should have presented it to the jury. (Id. at 8, 15; Reply Mem. at 25.)

4

The onus was on Day's attorney "to investigate this important fact as well as all of the discovery related to this gun and the Phillips robbery." (Sec. 2255 Mem. at 8)[4]

On this score Day highlights the testimony of Malcom VanAlstyne who testified at trial that the gun used in the Phillips robbery was different from that found on Neill when arrested at the courthouse but who was more equivocal about this information in his responses to the investigators and in his grand jury testimony. (Id. at 11-15.) Day feels his attorney should have ardently tilled this area of contradictory evidence but he made only a perfunctory effort to do so. (Id. at 12, 15.)

In his reply memorandum Day summarizes:

> I believe the violation or breach of a court instruction to be a real appeal issue, especially since there is Grand Jury testimony, police reports … that would easily prove Dylan Neill got high, committed armed robbery with Hill, and Holmes in which he used the .22 revolver in question then forgot it was in the coat. Only a few hours after the armed robbery he then went to the [S]pringvale Court House on an unrelated matter and was busted with the gun in his coat, bullets in his pocket. Thus Day did not give anyone a gun.

(Reply Mem. at 4; see also id. at 3-4,10-13.)

The United States stresses that the Phillips robbery was an issue collateral to the crack cocaine conspiracy charge that was being tried and that it was a sound trial tactic for his attorney not to seek admission of evidence of the robbery because it was an incident of violence that would potentially be associated with Day. (Gov't Resp. at 30.)[5]

---

[4] Day seems to believe that the investigative reports concerning the Phillips robbery and there being two guns used in the robbery support an argument that he did not provide Neill with a gun before the courthouse incident. (Id. at 8-9.) Day also points to testimony by one of the participants in the Phillips home invasion named Adam Hill who indicates that, contrary to Neill's representations, Hill did not know that the invasion was intended as a intimidation tactic as part of the conspiracy. (Id. at 10-11.)

[5] In his reply memorandum, Day maintains: "At the very least the court should resentence Day w/o the gun enhancement because the gun Day allegedly gave to Neill is a complete lie. Yes the court looks at the gun as collateral but when a witness lies to the jury it becomes a constitutional issue." (Reply Mem.at 23.) Day proceeds to "outline a few egregious concerns of false testimony including Dylan Neill." (Id. at 23-26.)

5

Under Strickland, this is the kind of strategic choice that presumptively falls within the range of reasonable professional assistance. 466 U.S. at 689, 699. I add, on a pragmatic level, that one problem with Day's theory is that Neill testified that it was Day who gave him the gun found on him at the courthouse. The suggestion that there might have been two guns involved in the earlier Phillips robbery would not measurably impeach Neill's testimony. As for the absence of fingerprints on the gun, there is no apparent reason for the prosecutor to have tested the gun or for defense counsel to have pressed for this testing. Even if the issue of whether or not Day gave Neill the gun found on Neill at the Springvale courthouse was important to Day's defenses on the crack cocaine conspiracy charge, the absence of Day's fingerprints on the gun could have been easily explained away by the prosecution.

### 2. *Advice to Plead Guilty*

Day relates that his attorney strenuously advised him to plead guilty rather than proceed to trial. (Sec. 2255 Mem. at 17.) He maintains that shortly after his arraignment his attorney, who had previously agreed that Day should go to trial, "became so adamant trying to convince Day to forego his constitutional right to Due Process that he … outright lied to his client Anthony Day." (Id.) He told Day that he was the only one of the group of co-defendants left to plead guilty; that his co-defendants were all there at the courthouse pleading guilty as they spoke. (Id.) Day found out when he got back to the holding cell that this was not true; his co-defendants informed Day that they were not pleading guilty. (Id.) This "lie" led to a heated argument between attorney and client in which the attorney told Day that it was too late to change his mind and that he would have to plead guilty; Day told his attorney that he should quit if he did not want to

6

represent Day at trial. (Id. at 18.) His attorney, Day further asserts, bet Day's father $100 that the attorney could convince Day to plead guilty. ( Id. at 17.)

As the United States points out, this claim fails on its face because Day did not in fact plead guilty. He went to trial. The type of disagreement between counsel and client described by Day does not give rise to a Sixth Amendment claim absent some measurable impact on the outcome of defense efforts. In other words, on his own version of the dispute between counsel and client, there was no Strickland prejudice.

### 3. *Failure to Move to Sever*

With respect to his claim that his attorney performed inadequately in not moving for a severance, Day relates that his father thought that it was important for Day to sever his trial from his co-defendants because of all the violence attributed to the broader conspiracy and the inference that might be drawn that Day was involved in the conspiracy because he hung around with his friend Justin Brooks. (Sec. 2255 Mem. at 18.) Day asserts that he was prejudiced by his attorney's failure to move for severance because the jury placed him among conspirators who pled guilty (and testified) to distributing cocaine base while Day maintained that he never sold crack cocaine. (Id. at 22.) He also complains that there was evidence of heroin sales by members of the conspiracy and that, while Day does not admit to selling heroin, he believes that if evidence of his selling drugs or a 'product' other than cocaine base came in it could have given the jury reasonable doubt as to the sales of cocaine base attributed to Day. (Id. at 24; see also id. at 25-27; Reply Mem. at 18, 20-22.)[6] Day concedes that his attorney tried

---

[6] In his reply memorandum Day explains that before trial the prosecutor tried to introduce evidence concerning marijuana and heroin distribution on the grounds that it was relevant to the cocaine base charges as the drugs were distributed through the same network. (Reply Mem. at 8.) His attorney objected and the Court provisionally ruled that the evidence would be excluded. (Id.) "[A]n attorney given proper

7

to lodge this attack but complains that he was unsuccessful. ( Sec. 2255 Mem. at 27.) "The jury may well have returned a different verdict for Day and not convicted him of the cocaine base/crack conspiracy," Day opines, "had Day been able to allow the discovery that inferred that he did not sell cocaine base/crack and there were other drugs sold among those []involved." (Id.) Day acknowledges that his attorney made an effort in closing to parse the distinction between Day's presence during illegal activity (conduct not charged) and his involvement in the charged conduct of a cocaine base/crack conspiracy, but asserts that this effort was perfunctory. (Id. at 28-29.)[7]

With regards to the prospects of a motion to sever, in United States v. Flores-Rivera, the First Circuit observed:

> we have held that "'[i]n the context of conspiracy, severance will rarely, if ever, be required.'" [United States v.] Brandon, 17 F.3d [409,] 440 [(1st Cir. 1994)] (quoting United States v. Searing, 984 F.2d 960, 965 (8th Cir.1993)); see also [United States v.] O'Bryant, 998 F.2d [21,] 24-26 [(1st Cir. 1993)]. To convict any of the defendants under a conspiracy theory, the government had to show the existence of an illicit scheme to import and distribute cocaine; and because Flores-Rivera and his codefendants were charged as coconspirators, virtually all the evidence relating to the other conspirators was also directly relevant to, and, therefore, independently admissible in, the prosecution's case against him. See O'Bryant, 998 F.2d at 26 (citing United States v. Riehl, 460 F.2d 454, 457-58 (3d Cir.1972)). And as we have held, "[w]here evidence featuring one defendant is independently admissible against a codefendant, the latter cannot convincingly complain of an improper spillover effect." Id. (collecting cases).

---

time could have used Day's alleged heroin use or distribution as an element of the defense," Day argues, "[e]specially given the fact that Day was around crack dealers allegedly selling another drug not crack, thus precluding him from a crack conspiracy." (Id. at 9.)

[7] In his reply memorandum, Day points to the use of the term "The Boys" in testimony at trial to refer to Brooks and Day as a reason that the trial should have been severed. (Reply Mem. at 6-7, 13.) He also faults his attorney for his failure to make objections to the use of this term at trial because he believes that there were times when the term "The Boys" was used to describe other individuals but the jury would have assumed it was meant to include Day. (Id. at 13 -14.) He acknowledges that his attorney pressed the matter and that the court insisted that the government make it clear to whom the term referred. (Id. at 14.) It seems to be Day's position that the term should have been defined each time it was used in testimony and it was his attorney's responsibility to object if this did not happen. (Id. at 14-15.)

56 F.3d 319, 325-26 (1st Cir. 1995) (footnote omitted). "The decision to grant or deny a motion for severance is committed to the sound discretion of the trial court" and will be reversed "only upon a finding of manifest abuse of discretion." Id. at 325 (collecting cases); accord United States v. Magana, 127 F.3d 1, 7 (1st Cir. 1997). In its judgment on the appeal of co-defendant Pierre-Louis the First Circuit concluded, "in the absence of a request for severance, we see no abuse of the court's broad discretion not to sever the defendants' trials sua sponte, as there is no basis on which to conclude that appellant did not receive a fair trial. See United States v. Magana, 127 F.3d 1, 7 (1st Cir. 1997)." United States v. Pierre-Louis, No. 05-1463 (1st Cir. May 30, 2006). Day, of course, is claiming ineffective assistance for not making such a request, but it seems evident that, as a matter of trial strategy, Day's counsel did not perform below the Strickland standard in not pressing this Court for severance of his trial from his co-defendants. See United States v. Shareef, 190 F.3d 71, 77 -78 (2d Cir. 1999).[8]  Furthermore, Day never alleges that he (or his dad for that matter) ever actually asked his attorney to file a motion to sever.

### 4. *Access to Discovery*

With respect to counsel's performance vis-à-vis sharing discovery with Day, Day claims that he requested access to 1900 pages of discovery but his attorney refused the request and it was only after "numerous arguments and haggling" that his attorney sent his secretary to the jail with a thirty-pound box of discovery. (Sec. 2255 Mem. at 18-19.) However, Day was only allowed two hours to review this large volume of discovery. (Id. at 19.) Now that he received this discovery at his present place of incarceration, Day

---

[8] With respect to the prejudice prong of the Strickland inquiry, this Court is in the best position to analyze whether or not it would have seriously considered a motion to sever. See McGill, 11 F.3d at 225.

9

believes, judging by the Bates stamps, that there are 150 pages missing. (Id.) Day wrote his attorney to ask if his attorney was sure he received all the documents from the Government. (Id.) His attorney responded that he had reviewed all the materials during the course of trial, he was provided with all the materials from the U.S. Attorney's Office, and represented that he had not taken anything out of the file prior to turning it over to Day's parents. (Id.) In a second follow-up letter responding to Day's inquiry, his attorney indicated that it was his general practice to review all discovery although he had no specific recollection of counting every document in Day's case. (Id. at 20.) In this second letter counsel also indicates that the documents that Day perceived as missing may have been shuffled around and mixed-up at counsel table during trial as Day and his attorney sifted through them as necessary. (Id.) Pointing to his attorney's admission in this letter that he did not count the document every day before leaving court, Day opines that, "it only seems practical that the attorney, paid or court appointed[,] should use some method, whether it be counting or whether reconciling sequence numbers to be absolutely sure that he [The Attorney] has all the discovery documents given to his care." (Id.) Day maintains that "there could well be useful impeachment information within those 169 documents seemingly missing. (Id.)[9] It is "quite clear," Day contends, "that his attorney "never read all the discovery pages… since only a few had been marked and highlighted" by him and "some very important impeachment statements were left unmarked except by Day himself." (Id. at 19.)

---

[9] In his second letter Day's attorney proffered a second, what he described as less likely, possible explanation for the state of discovery; perhaps the documents became misplaced when Day's parents had custody of the discovery files. (Id.) Day states that this is "not a possibility" and represents that his parents did not read or disturb the documents before sending the materials on to Day. (Id. at 20-21.)

10

I agree with the Government that Day's ineffective assistance claim apropos his attorney's provision of discovery is far too speculative to consider 28 U.S.C. § 2255 relief. Day does not dispute that he and counsel did in fact have co-access to the discovery in question during trial while at the defense table. Obviously, it was necessary for counsel to retain custody of the discovery during trial preparation and during the trial recesses. With respect to the access to discovery after the trial, Day was represented by different counsel on appeal; Day does not complain of his performance.

Although there might be a scenario where an attorney's failure to turn over certain key discovery documents could generate a Sixth Amendment claim, Day's description of his access to discovery does not. See Carillo v. United States, 995 F. Supp. 587, 591 (D.V.I.1998); Gaughan v. United States, 2:02 CV 169, 2006 WL 2798155, *13 (N.D. Ind. Sept. 28, 2006); White v. Cason, No. 04-CV-75071, 2006 WL 763194, *11 (E.D. Mich. Mar. 24, 2006); Ramsden v. Warden, Dept. of Corrs., No. Civ. 02-138-B-S, 2003 WL 356031, *10 (D. Me. Feb. 14, 2003)(Magis. J. recommended decision) adopted 2003 WL 1960592 (D. Me. Apr. 24, 2003).

     5.     *Pre-trial Contact with His Attorney*

In his memorandum, Day also complains that he was denied access to counsel as the jail only facilitated collect calls. (Sec. 2255 Mem. at 21.) He offers his mother's affidavit in which she represents that when she tried to relay Day's messages to counsel, her son's attorney was hostile. (Id.) Counsel did not want Day's mother asking questions on behalf of her son, he indicated that Day and not his mother was his client, and, in a curt manner, told her that he would talk to Day when he felt like it. (Id.) Day also maintains that Judge Singal did not like his father and that when Day's father asked Day's

11

attorney about this his attorney began to scream and yell. (Id.) Day states: "It is alarming when a client's attorney implies that the Judge who holds your future in his hand may be bias[ed], because he doesn't like the client's father." Day thinks his attorney should have addressed this issue in a "professional and ethical manner" and there is no record that he did so. (Id. at 21-22.)

As with Day's claim respecting counsel pressuring him to plead guilty, this ground does not contain allegations about counsel's performance that rise to a Sixth Amendment violation. Absent credible evidence that counsel's conduct prejudiced the outcome of the case, there is no Sixth Amendment requirement that counsel interact with a client's family at all or that when counsel is approached by family members he or she must be cordial and receptive.

### 6. *Un-pursued Motion to Suppress/Failure to Properly Object*

Day believes that his attorney should have filed a motion to suppress evidence concerning a traffic stop involving Day by Trooper Flint. (Sec. 2255 Mem. at 29; Reply Mem. at 28.) Day argues that Flint indicated at trial that Day told him that he only knew co-defendant Ricardo Pierre-Louis for two months and Day counters that he in fact told Flint that he knew this individual for a few months. (Sec. 2255 Mem. at 29.) Day believes that this representation by Flint was prejudicial to his defense because it made Day "out to be lying." (Id.) Day faults his attorney for only objecting to the admission of the evidence on grounds of relevance. (Id. at 30.) He maintains that while Flint described his talk with Day as a conversation, Day would characterize it as an interrogation. (Id. at 30-32.)

In his reply memorandum he explains:

> [T]here is ample evidence that the government presented to show Day and Ricardo knew each other. The government used this statement to taint Day's character as a liar, when in fact Day had not said he knew Ricado for <u>two</u> months, but rather he said he knew Ricardo for a few months, in causal conversation, not under arrest, by saying a few as opposed to saying <u>two</u> it shows Day was just talking casually in general as young people do and not lying. The Government blows this up and out of proportion when [the prosecutor] misleads the jury and states the fact as two years during closing arguments relating to Day.

(Reply Mem. at 28.)

It is not apparent on this record what the legal grounds for a motion to suppress would have been.[10] Certainly, the fact that the evidence/testimony might be prejudicial to a defendant is not sufficient to support such a motion; to state the obvious, it is the very nature of a criminal proceeding that a prosecutor's evidentiary decisions are aimed at prejudicing the defendant in the sense of establishing his guilt. The same is true regarding counsel's basis to object to the testimony; certainly counsel would have made no headway with the court had he objected on the grounds merely of potential prejudice to his client rather than relevance. Flint's testimony did not carry a "danger of unfair prejudice" that would be excludable under Federal Rule of Criminal Procedure 403.

### 7. *Sentencing Advice*

"One of the most egregious errors by Anthony Day's court appointed counsel", Day contends, came during sentencing. (Sec. 2255 Mem. at 16.) Day faults counsel for advising him to stand up and address the court during sentencing and acknowledge "some small part" in the conspiracy in the hopes of mitigating his sentence. (<u>Id.</u>) Day does not think his attorney adequately cautioned him to exercise restraint during this allocution. (<u>Id.</u>) He also contends that it was not right for Day to acknowledge his part in the conspiracy because he knew full well that he had never sold cocaine base/crack (<u>id.</u>), and

---

[10] The United States does not address this claim.

13

had so informed his attorney (id. at 17). (See also Reply Mem. at 26.)   The fact that Day made this 'confession' at sentencing was pointed out to Day by Day's appellate counsel as one of the difficulties with his efforts to seek redress through a direct appeal.  (Sec. 2255 Mem. at 16-17.)

In response, the United States argues that Day's own admission to the content of the PSI "trumped any advice to admit that he had some small part in the conspiracy" and, so, there was no Strickland prejudice.  (Gov't Resp. at 34.) To this I add that Day does not explain how his attorney could have anticipated Day's sentencing concession.  It is the kind of allocution statement by a defendant for which an attorney cannot be held accountable.  Furthermore, in term's of counsel's sentencing efforts – as the United States points out -- Day's counsel succeeded in reducing the sentencing range from 235-293 months to 151-188 and then persuaded the court to settle on a defense-friendly 165 months within that variance.  (Id.)

### B.     *Undisclosed Impeachment Evidence*

In somewhat of a different take on his ineffective assistance of counsel claim concerning the Phillips robbery and the gun found on Neill's person at the courthouse afterwards, Day asserts that the Government intended to bring into evidence a .22 caliber revolver recovered from Dylan Neill when he was arrested at a courthouse and get Neill to testify that he was given the gun by Day.  (Sec. 2255 Mem. at 33.)   He believes that he was entitled to impeachment evidence related to the gun.  (Id.)  He speculates that the gun was fully investigated and tested and that it was impossible that Day's fingerprints were on it.  (Id.)  While the absence of fingerprints might not have fully absolved Day, he thinks it would definitely justify further testimony on the question of how Day could have

14

handed the gun to Neill without leaving fingerprints. (Id. at 34.) Day also maintains that the bullets for the gun were found in Neill's pockets but Neill never testified that he stopped to acquire the ammunition. (Id. at 34.) (See also Reply Mem. at 24-25, 27.)

The United States responds that the firearm evidence was collateral to the crack cocaine conspiracy charge on which Day was being tried. (Gov't Resp. at 35-36.) It indicates that there is in fact no fingerprint or ballistic evidence about the firearm in question. (Id. at 36 n. 8.) It concedes: 'Certainly Day's possession of a gun impacted his Guideline sentencing range. However, that aspect of Day's case has not been challenged." (Id.)

In addition, Day complains that the Government did not supply the complete phone transcripts and records that would have allowed him to reconcile all of the numerous times that alleged customers called Day. (Sec. 2255 Mem. at 34.) He speculates that the Government turned over a sanitized list of phone calls that were advantageous to its cause. ( Id.) As an example Day states that Ms. Ford testified to many times when she purchased products from Brooks and/or Day and that her number might well be on Day's incoming calls records. (Id.) Day speculates that he might have been able to impeach witnesses had he had the complete records. (Id.)

With respect to this portion of Day's non-disclosure claim, the Government stresses that Ford testified that she saw Brooks and Day receive crack cocaine approximately ten times in an approximately seven-month period and that any phone records would not have controverted/impeached this testimony. (Gov't Resp. at 36.) It also points out that seven other witnesses described Day's role as a distributor in the crack cocaine conspiracy. (Id.)

15

As to both facets of this ground, I conclude that the United States' assessment that they utterly lack merit is spot on. Day is clutching at straws in thinking that this allegedly undisclosed evidence would have had any meaningful impact on the jury's verdict.[11]

### C. Improper Instruction of Cocaine Base and Crack

Day believes that the Court usurped the fact-finding role of the jury when it instructed the jury over Day's objection that cocaine base is synonymous with crack cocaine. (Sec. 2255 Mem. at 35.) He argues, "it was up to the jury to make a determination based upon the evidence they heard as to whether the substances described by various individuals as crack really were in fact Cocaine Base as required by the indictment." (Id.)

All that needs to be said vis-à-vis this claim is that the First Circuit Court of Appeals examined the instruction on the direct appeal of co-conspirator Pierre-Louis and concluded, "the court did not usurp the function of the jury but rather instructed it as to the law in regard to the legal equivalence of cocaine base and crack cocaine. See United States v. Pho, 433 F.3d 53, 55 n.1 (1st Cir. 2006)." United States v. Pierre-Louis, No. 05-1463 (1st Cir. May 30, 2006).

### D. Newly Discovered Evidence

With regards to his claim that he has newly discovered evidence, Day contends that he received several unsolicited affidavits from witness – Tamara Hussey, Sherry Harris, Don Holmes, and Sara Preston – who described plans to script their testimony. (Sec. 2255 Mem. at 36.) "Although these affidavits are crude in form and in this context

---

[11] In his reply memorandum Day also speculates that maybe the prosecution withheld discovery on Dylan Neill about the Phillips robbery and faults his attorney for not seeking this discovery prior to trial. (Reply. Mem. at 12-13.) This additional discovery claim is far too speculative and is asserted too late in this proceeding to merit any discussion.

may not prove the witness lied," Day opines, "it certainly seems to be an appropriate transition to interrogatories by the petitioner that may reveal that the accounts of the witnesses' testimony on the stand were not indicative of the actual events and that this prejudiced the petitioner and was not a fair venue in which he was tried." (Id.)[12]

Additionally, Day claims that once he received his discovery he became aware that there was grand jury testimony that contravened the theory that one gun was used in the Phillips robbery. (Id. at 36-37.) Day seems to believe that if he had this evidence at trial he could have impeached testimony that Day had given Neill the gun that was found on Neill's person at the courthouse; he could have argued that Neill possessed the same gun as he used in the Phillips robbery. (Id. at 37.)

I have reviewed the affidavits submitted by Day and agree that they do not prove that the witnesses lied. They are not a sufficient basis in the context of collateral review to justify interrogatories or any further evidentiary proceeding. His representation about grand jury testimony is conclusory and gives this court no grounds for further inquiry, especially because, as stated before, the evidence apropos the gun attributed to Day was a sentencing question and was very much tangential to his guilt on the crack cocaine conspiracy charge.

### E.     *Prejudicial Testimony and Procedure*

Finally, Day believes that it was impermissible to introduce testimonial evidence attributing the gun found on Neill to Day because of a co-defendant's attorney's inquiry on the subject when the Court had previously ruled that the evidence of the Phillips

---

[12]  In his reply memorandum Day focuses on the testimony of Christina Ford and argues that she was not in court by her own choice (Reply Mem. at 18), and that after trial he has discovered that she has an arrest record (id. at 18-19). He also faults his attorney for allowing to go unchallenged testimony by Ford that seems to refer to Brooks and Day as if they were one individual. (Id. at 20.) He stresses that not all the discovery pertaining to Ford was provided to the defense. (Id. at 20-21.)

17

robbery would be excluded. (Sec. 2255 Mem. at 38.) Day concedes that the Court was probably not aware, when it gave the other defense attorney leeway in cross-examining on this topic, that this would open the door to evidence linking Day to the gun. (Id. at 39.) However, Day faults the court for not allowing him to further cross examine on this issue. (Id.) Day also asks whether his trial was "free enough from errors to catch every witness that lied," and told alleged falsehoods in the hopes of mitigating their punishment. (Id. 39 -40.) And he complains that the government's last minute, morning-of-trial attribution of heroin to Day – which was handled by the Court by indicating that the term "product" would be used in testimony– resulted in the possibly prejudicial confusion in which the jury might have attributed too much cocaine base to Day. (Id. at 40 -41.)

This ground is simply a means of rehashing Day's perception that he was seriously prejudiced by the testimony that he gave Neill the gun found on Neill's person at the courthouse, his speculation that some of the witnesses may have bent the truth, and the use of the term "product" as opposed to a specific identification of the drug in question.  These complaints have no merit wrapped together under the notion that there was prejudicial admission of evidence at his trial.

## *Conclusion*

For the reasons set forth above, I recommend that the Court deny Day 28 U.S.C. § 2255 relief.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum,

within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

October 31, 2007.

/s/Margaret J. Kravchuk
U.S. Magistrate Judge